# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Charles P. Kocoras | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 94 C 897 | **DATE** | 8/29/2000 |
| **CASE TITLE** | In Re: Brand Name Prescription Drugs | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] **ENTER MEMORANDUM OPINION:** We deny Defendants' motion (Doc 4438-1) to strike the supplements to the expert reports of Roy Weinstein.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | Document Number |
| | No notices required. | number of notices | |
| | Notices mailed by judge's staff. | AUG 30 2000 | |
| | Notified counsel by telephone. | date docketed | |
| ✓ | Docketing to mail notices. | docketing deputy initials | 4511 |
| | Mail AO 450 form. | AUG 30 2000 | |
| | Copy to judge/magistrate judge. | date mailed notice | |
| SCT | courtroom deputy's initials | ED-7 FILED FOR DOCKETING 00 AUG 29 AM 11:38 Date/time received in central Clerk's Office | mailing deputy initials |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE BRAND-NAME PRESCRIPTION DRUGS ANTITRUST LITIGATION | ) ) ) ) | Master File No. 94 C 897 |
| This Document Relates to: | ) ) ) | |
| RITE AID (94C 1200), RX USA (94 C 7034), HOOK SUPERx (95 C 2924), MALLEY'S PHARMACY (94 C 2650), BROOKSHIRE BROTHERS (95 C 3032), PHARMHOUSE CORP. (95 C 3141), F&M DISTRIBUTORS, et al. (95 C 4776) | ) ) ) ) ) ) ) ) ) | MDL 997 |

DOCKETED
AUG 3 0 2000

## MEMORANDUM OPINION

**CHARLES P. KOCORAS, District Judge:**

Before the Court are the parties' briefs on Certain Defendants' Motion to Strike the Supplements to the Expert Reports of Roy Weinstein. For the reasons set forth below, we deny the motion.

### BACKGROUND

On June 20, 2000, the so-called Rite Aid and Albertson Defendants ("Defendants") filed a motion to strike the supplemental expert reports of Roy Weinstein filed by the Rite-Aid and Malley's Plaintiffs ("Plaintiffs"). Weinstein's

4511

expert reports were released in three phases: 1) his initial 1995 report; 2) his July 1996 supplement; and 3) his February 2000 update. Defendants claim that the Plaintiffs failed to properly designate Weinstein in the first place,[1] and that the professed updates to his original expert report contain new theories and methodologies in violation of this Court's orders. As such, Defendants request that we strike these supplements.[2]

As an initial matter, we note that we have already ruled on the validity of the June 1996 supplement, and therefore Defendants' motion to strike this document is denied. On February 17, 2000, Defendants asked this Court to strike the July 1996 supplement, but we ruled that it could stand because there were conflicting versions of the underlying cause of Weinstein's delay in filing the July 1996 supplement. Having already ruled on this motion, we will not entertain further Defendants' challenge against its timeliness and whether it utilized a different methodology. Further, because this document is an appropriate update to Weinstein's report, we will use both the July 1996 supplement and Weinstein's September 1995 original

---

[1] We find no merit to this argument, and will not comment upon it further.

[2] Defendants also have a <u>Daubert</u> challenge to the validity of the methodology, which we will not pass judgment upon, but will leave for each individual trial court.

4511

report as standards from which to measure any of Defendants' claimed methodology deviations.

This leaves us with Defendants challenge to Weinstein's February 2000 update. Defendants claim that in this recent supplement Weinstein abandoned his prior methodology. In oral argument before this Court on June 20, 2000, counsel for Defendants stated that their central contention was that "in his deposition [taken on October 30, 1995] [Weinstein] said, 'I am only going to look at mail orders and PBMs [Purchase Benefit Managers] affiliated with mail orders." Defendants claim that despite this testimony, Weinstein prepared his February 2000 report utilizing other entities that were not mail orders nor PBMs affiliated with mail orders. Thus, we will compare Weinstein's statements and data regarding PBMs contained in his 1995 and 1996 reports to that in his February 2000 report, with consideration given to the pertinent testimony from his deposition.

## A. Weinstein's September 1995 Report

In his report dated September of 1995, Weinstein made the following statements regarding damages:

> Retail purchasers of pharmaceutical products were damaged by defendants' efforts to maintain and stabilize prices. A conservative method for measuring these damages will reflect comparisons between prices paid by retail firms and prices paid by favored competitors who benefitted from various types of discounts made available by manufacturers. Exhibit 21

contains a preliminary summary of discounts available to mail order pharmacies. This exhibit was prepared from selected contracts of Medco (the largest mail order pharmacy) and Thrift Express with various pharmaceutical manufacturers. Information contained in Exhibit 21 indicates that discounts available in the form of rebates can amount to 5-10 percent or even more. Discounts in this range provided mail order pharmacies with a significant competitive advantage over retail pharmacy competitors.

Exhibit 22 contains a summary of discounts available to pharmacy benefit management firms (PBMs) and HMOs. These discounts also are significant and constitute further evidence of price levels that would have existed if manufacturers had engaged in free and open competition.

Exhibit 23 contains this same type of information organized by product category. It was prepared by grouping information contained in Exhibits 21 and 22. When the tabulation of information regarding plaintiffs' actual purchases of brand-name pharmaceutical products becomes available, overcharges will be calculated on a product category basis. That is, within each product category, overcharges will reflect comparisons between prices paid by plaintiff purchasers and prices that would have been paid had manufacturers competed for plaintiffs' business by offering competitive prices similar to those that were made available to mail order pharmacies such as Medco, PBMs and HMOs.

We also have observed that some discounts have recently been offered to retail pharmacies. These are summarized in Exhibit 24. In the course of calculating overcharges, these discounts, if actually received, will be considered, i.e., overcharges will be reduced to the extent that these discounts actually are reflected in prices paid.

Defendants' anticompetitive conduct had an adverse impact on competition in the sale of prescription pharmaceuticals. Plaintiff purchasers of such products were damaged in that the prices they paid exceeded competitive levels. They also were damaged in that business was diverted to other purchasers of pharmaceutical products who received discounts.

The overcharge damages will be calculated once plaintiffs' purchases have been fully tabulated.

## B. Weinstein's October 1995 Deposition Testimony

Defendants then conducted the deposition of Mr. Weinstein on October 30, 1995. As captured on pages 517-520 of his deposition, Weinstein testified as follows:

> Q: One of the things I want to ask you about on Page 2 of your report, it says that, "Work also is ongoing with respect to actual prices paid by plaintiffs and plaintiffs' competitors." Do you see that reference in the last paragraph?
> A: I do.
> Q: Who are plaintiffs' competitors with respect to whom work is ongoing to calculate the actual prices they paid?
> A: That sentence refers to mail order companies like Medco.
> Q: Anybody else?
> A: CareMark, Thrift Express. I think there might be some others identified in my report.
> Q: They're included as competitors for purposes of that calculation of work because they are mail order entities?
> A: Yes, sir.
> Q: Is there any work ongoing with respect to calculations and other work on actual prices paid by entities other than mail orders and the plaintiffs?
> A: Yes.
> Q: So there's more work ongoing than just described here in this sentence?
> A: Well, the general reference is to the effort to calculate overcharge percentages based on rebates paid to mail order companies and other entities that receive rebates.
> Q: So are you saying that the other entities that received rebates are all competitors as well for this purpose?
> A: No. No, I'm not.
> Q: The only ones that got rebates that you're going to say are competitors are the mail order?
> A: That's true, at least insofar as the overcharge calculation is concerned.

Q: Yes. Now, are you going to use the rebates obtained by other managed care entities that are not mail order pharmacies for purposes of claiming there was a conspiracy or alternatively measuring the impact of the conspiracy?
A: I'm going to consider, as I have considered, that information in connection with my conclusions about the absence of competition in this industry. I don't plan to use those rebates for purposes of calculating overcharges.
Q: And when you use the mail order data, are you going to limit your analysis to the rebates paid on prescriptions dispensed through mail order or will it include prescriptions and rebates paid on those prescriptions that are dispensed in retail pharmacies under some PBM contract?
A: Both.
Q: Both?
A: I'm going to consider both, yes.
Q: So it isn't mail order rebates, but it's rebates agreed with PBMs who have a mail order operation?
A: Well, I said I'm going to consider both.
Q: So, you don't know what you're going to do with respect to that. You're going to wait to see what the figures show?
A: Well, I need to be able to review this rebate information which the people have been working on for some time now–
Q: Okay.
A: –before I can complete the calculation.
Q: So there are some decisions yet to be taken as to his damage model?
A: Well, I don't need to review that information before I can complete the calculations; that is true.

Deposition of Roy Weinstein of October 30, 1995, pps. 517-520.

## C. Weinstein's July 1996 Report

In a letter dated July 3, 1996, Plaintiffs' counsel Steve D. Shadowen disclosed a letter from Weinstein updating his prior report, including overcharge figures, summary tables, and his primary worksheets. Specifically, Weinstein stated:

In my expert report of September 28, 1995, I stated "within each category, overcharges will reflect comparisons between prices paid by plaintiff purchasers and prices that would have been paid had manufacturers competed for plaintiffs' business by offering competitive prices similar to those that were made available to mail order pharmacies such as Medco, PBMs and HMOs." I also stated that a conservative method for measuring overcharges involves the use of rebates made available to favored purchasers.

In my deposition, I explained that overcharges are calculated by applying rebate percentages described in my Expert Report to plaintiff pharmaceutical purchases and that damages would be limited to therapeutic categories within which rebates were paid. I also testified that overcharges are at least in the range of five to ten percent and possibly higher. Finally, I testified that records were produced by the defendants necessary to measure rebates and tabulate plaintiffs' purchases were incomplete and, accordingly, extremely difficult to work with. The gaps in these records have now been filled.

Accordingly, I have enclosed purchase and overcharge summaries. I also have enclosed a computer diskette which contains my principal workpapers.

On the diskette enclosed with Weinstein's report were his work product, consisting of charts listing the Manufacturer, the collapsed product, the contract coverage, the total rebate, the average rebate, the basis for the rebate, and the converted average. On the first page alone, the partners include Aetna (an IPA model HMO), All IPAs, Blue Cross/Blue Shield of Illinois (a PBM), Cigna Healthplans, Inc.(an IPA model HMO), Clinical Pharmacy Advantage, FHP, Inc., Harvard

Community Health Plan, Humana, Inc., Managed Prescription Services, and Medco Containment Services.

**D. Weinstein's February 2000 Report**

In his February 2000 supplement, Weinstein stated that the "favored entities considered include mail order pharmacies, pharmacy benefit management entities (PBMs), and independent practice association HMOs." Weinstein further testified that he had "used manufacturer contracts to create a database of rebates provided by manufacturers."

## DISCUSSION

Defendants concentrate on Weinstein's statements in his October 1995 deposition that his overcharge calculation would be concerned only with mail order entities that received rebates.[3] Weinstein further stated that "he did not <u>plan</u> to use [rebates obtained by other managed care entities that are not mail order pharmacies] for purposes of calculating overcharges."

Plaintiffs alert the Court to five occasions where Weinstein testified that he used PBM and/or HMO rebates, in addition to mail order rebates, to measure the

---

[3]Defendants also argue that Weinstein changed from looking at the "actual prices paid" by Plaintiffs to creating a database of average rebates the manufacturers would offer. As discussed, however, once Weinstein had received all of the information from Defendants, completed his analysis, he attached to his July 1996 report a rebate database. Thus, we find no change in methodology based on prices -v- rebates.

overcharge damages sought by Plaintiffs. For example, Weinstein stated "Well, the general reference is to the effort to calculate overcharge percentages based on rebates paid to mail order companies <u>and other entities that receive rebates</u>." In addition, immediately following the exchange highlighted by Defendants, the following exchange took place which should have indicated to Defendants that Weinstein had not yet determined which entities he would consider for rebates:

> Q: So it isn't mail order rebates, but it's rebates agreed with PBMs who have a mail order operation?
> A: Well, I said I'm going to consider both.
> Q: So, you don't know what you're going to do with respect to that. You're going to wait to see what the figures show?
> A: Well, I need to be able to review this rebate information which the people have been working on for some time now–
> Q: Okay.
> A: –before I can complete the calculation.

Furthermore, Weinstein's July 1996 report uses just this type of data, which was produced to Defendants via diskette.

Wedo not believe that Weinstein ever unequivocally stated he would not be using non-mail order PBMs or HMO rebates. His 1995 report indicates possible use of this data, and his 1996 report makes actual use of this data. Consequently, we do not consider the supplements to be a deviation from the original methodology.

We believe it is important to note that the statement cited by Defendants was not absolute, but was hedged. Weinstein said it was not his "<u>plan</u>" to use non-mail

order managed care entities to calculate overcharges. Simply put, plans change; and the July 1996 report reflects this change, which is in line with Weinstein's statement in his 1995 report that he would conduct price comparisons between Plaintiffs and "mail order pharmacies such as Medco, PBMs and HMOs." When Weinstein prepared this report and gave testimony at his deposition, he did not possess all of Defendants' data. Having received and analyzed all of this data in the first-half of 1996, Weinstein prepared his final overcharge damages data, using PBMs (including non-mail order PBMs) and HMOs. This information was supplemented by the February 2000 report, which set forth the same methodology. We do not believe this contradicts his September 1995 report, nor his October 1995 deposition testimony. Defendants' motion is denied.

## CONCLUSION

For the reasons set forth above, we deny Defendants' motion to strike.

Charles P. Kocoras
United States District Judge

Dated: August 29, 2000